B. John Casey (OSB No. 120025)
John.Casey@stoel.com
**Stoel Rives LLP**
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Christopher J. Renk (*pro hac vice* to be filed)
 Chris.Renk@arnoldporter.com
Michael J. Harris (*pro hac vice* to be filed)
 Michael.Harris@arnoldporter.com
**Arnold & Porter Kaye Scholer LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360

Rhonda R. Trotter (*pro hac vice* to be filed)
 Rhonda.Trotter@arnoldporter.com
**Arnold & Porter Kaye Scholer LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Attorneys for Plaintiffs Nike, Inc.
and Converse, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

NIKE, INC. and CONVERSE INC.,

        Plaintiffs,

v.

JEFFREY WASKOWIAK and KICKRICH, LLC,

        Defendants.

Case No. 3:21-cv-1068

**COMPLAINT FOR:**

**(1) Trademark Infringement in Violation
   of 15 U.S.C. § 1114**
**(2) False Designation of Origin / Unfair
   Competition in Violation of 15 U.S.C.
   § 1125(a)**
**(3) Trademark Dilution in Violation of 15
   U.S.C. § 1125(c)**
**(4) Common Law Trademark
   Infringement and Unfair Competition**
**(5) Trademark Dilution in Violation of
   O.R.S. § 647.107**
**JURY TRIAL REQUESTED**

Plaintiffs Nike, Inc. ("Nike") and Converse Inc. ("Converse" and collectively with Nike, "Plaintiffs") for their Complaint against Defendants Jeffrey Waskowiak and KickRich LLC (collectively, "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.      Nike and Converse are two of the most successful footwear companies in the world. Through hard work and significant investment of resources, they have built iconic brands with sought-after products and experiences.  A critical aspect of those efforts has been the development of distinctive trademarks on which consumers rely to identify their authentic products and experiences.  Nike and Converse maintain strict control over the use of their trademarks in connection with their products.  They carefully manage which brands to collaborate with and thoughtfully select where, when, and how often their marks are used to guide the public perception for their iconic brands.  But those trademarks, and thus Nike's and Converse's brands, face a growing threat—infringement and dilution by "customizers" who are reselling Nike and Converse products that have been materially altered in ways the brands have never approved or authorized.

2.      These "customizers" include entities, like Defendants, that make and sell what they call "custom" versions of Nike's and Converse's products. Although Defendants' "custom" products may use pieces of genuine Nike and Converse shoes, the genuine parts are so altered and combined with non-genuine parts or other brands' logos that they can no longer be meaningfully considered Nike or Converse shoes.  Instead, they become new products over which Nike and Converse have no control.

3.      Defendants, for example, make and sell "custom" footwear products that combine purportedly genuine Nike Air Jordan 1 soles with uppers fabricated entirely by Defendants, including reproductions of Nike's famous Swoosh design and other protected trade dress. Defendants represent that "every pair is hand-made from scratch in [their] private studio" and

market each pair for hundreds or up to several thousand dollars each.  As just one example, Defendants promote the "custom" product shown below as the "Custom TERRA Nike Air Jordan 1" and sell these shoes for $2,500 per pair.



**Defendants' fake "Custom TERRA Nike Air Jordan 1"**

4.    Defendants also make and sell "custom" footwear that falsely affiliates Nike with other brands.  For example, Defendants make and sell a footwear product they promote as the "Custom Prime Nike Air Jordan 1" that falsely affiliates Nike with Amazon.  For this product, Defendants start with a genuine Nike Air Jordan 1 shoe, add a "custom leather lined tongue made from Amazon Prime bubble mailer packaging," add "metal eyelets to the eye-stays," and then apply Amazon Prime branding in multiple locations on the upper right next to the signature Nike Swoosh design.  Defendants sell these fakes for $850 per pair.  An example is shown below.



**Defendants' fake "Custom Prime Nike Air Jordan 1"**

5. These unauthorized "customizations" cause and are likely to cause confusion, mistake, and/or create an erroneous association as to the source, origin, affiliation, and/or sponsorship of the products. It is Nike's prerogative to choose who it collaborates with, which colorways it releases, and what message its designs convey. These considerations are an integral part of Nike's branding and quality control over its designs. By applying unauthorized "customizations" to Nike's shoes, insinuating collaborations that do not exist and applying colorways and materials that have not been evaluated against Nike's quality and design standards, Defendants have and will continue to cause substantial harm to Nike's brand and hard-earned reputation.

6. Defendants' infringement and dilution does not end there. Defendants also make and sell laser cut and digital download "shoe patterns" that allow others to make fakes for several of Nike's iconic and trade-dress protected footwear styles, including the Air Force 1, the Dunk, and the Air Jordan 1. Defendants represent that these patterns include "all necessary shapes for each upper piece, the lining, reinforcements, foams, and heel counter." In other words, Defendants' customers purchase these patterns to make their own fake Nike uppers bearing the famous Swoosh design and other protected trade dress. Defendants sell these patterns for hundreds of dollars a pattern. Several examples are shown below.



**Defendants' "Nike Air Force 1 Low Shoe Pattern"**

 

**Defendants' "Nike SB Dunk High Shoe Pattern"**          **Defendants' "Nike Air Jordan 1 High Shoe Pattern"**

7.      Additionally, Defendants sell other products, such as clocks and stools, that are prominently emblazoned with Nike's and Converse's famous marks, but which were never manufactured or approved by either company.  Examples of these infringing products are shown below.

          

**Defendants'  Classic Logo Desk Clock**          **Defendants' Just Do It Sneaker Stool**

8.      Defendants' conduct constitutes trademark infringement, false designation of origin, unfair competition, and trademark dilution.  And the harm to Nike, Converse, and their brands is significant.  These illegal "customizations," shoe patterns, and other products dilute Nike's and Converse's trademark rights and they confuse, and are likely to confuse, consumers as to the source, origin, affiliation, and/or sponsorship of the products, especially in the post-sale environment.  In turn, Nike and Converse lose control over their brands, business reputations, and associated goodwill, which they have spent decades building.

9.     The damage to Nike and Converse from unauthorized "customizations" is considerable.  For example, in late March, 2021, a company called MSCHF Product Studio, Inc. ("MSCHF") began taking orders for a limited edition of Nike Air Max 97 shoes customized to prominently feature a satanic theme.  Despite significant alterations, including adding red ink and human blood to the midsole, adding red embroidered satanic-themed detailing, and adding a bronze pentagram to the laces, the so-called "Satan Shoes" still prominently displayed the Nike Swoosh design.  Almost immediately after the "Satan Shoes" were announced, Nike began receiving criticism from consumers who believed that Nike was endorsing satanism.  Some consumers even stated they never wanted to purchase Nike products again because of the "Satan Shoe."

10.     Nike and Converse have no desire to limit the individual expression of creatives and artisans, many of whom are some of the brands' biggest fans. But Nike and Converse cannot allow "customizers" like Defendants to build a business on the backs of their most iconic trademarks, undermining the value of those marks and the message they convey to consumers. The more unauthorized "customizations" get manufactured and sold, the harder it becomes for consumers to identify authorized collaborations and authentic products; eventually no one will know which products Nike and Converse have approved and which they have not.  Nike and Converse, therefore, bring this lawsuit to stop "customizers," like Defendants and others, from making and selling illegal "customizations" of Nike's and Converse's products and other products illegally using their trademarks.

## THE PARTIES

11.     Nike is a corporation organized under the laws of the State of Oregon with a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.

12.     Converse is a corporation organized under the laws of the State of Delaware with a principal place of business at One High Street, North Andover, Massachusetts 01845.  It is a wholly owned subsidiary of Nike.

13.     On information and belief, Jeffrey Waskowiak is an individual residing in Portland, Oregon.

14.     KickRich LLC is a limited liability company organized under the laws of the State of Oregon with a principal place of business at 6939 North Macrum Avenue, Portland, Oregon, 97203.

15.     On information and belief, Jeffrey Waskowiak is the founding member of KickRich LLC.

## JURISDICTION AND VENUE

16.     This action arises under the trademark and anti-dilution laws of the United States, 15 U.S.C. § 1051, et seq., and under statutory and common law of unfair competition.  This Court has subject matter jurisdiction at least under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

17.     On information and belief, this Court may exercise personal jurisdiction over Defendants at least because Defendant Waskowiak resides in this District, Defendant KickRich's principal place of business is located within this District, Defendants do business in this District, and Defendants have committed acts of infringement at issue in this Complaint in this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Waskowiak resides in this District, Defendant KickRich's principal place of business is located within this District, Defendants do business in this District, and Defendants have committed acts of infringement at issue in this Complaint in this District.

## FACTUAL BACKGROUND

I.      <u>NIKE</u>

19.     Nike's principal business activity is the design, development and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

20.     Nike is the largest seller of athletic footwear and apparel in the world.

21.     Nike sells its products directly to consumers through Nike-owned retail stores and digital platforms, and to retail accounts and a mix of independent distributors, licensees, and sales representatives in virtually all countries around the world.

22.     Nike uses trademarks on nearly all of its products.

23.     Having distinctive trademarks that are readily identifiable is an important factor in creating a market for Nike's products, in identifying Nike and its brands, and in distinguishing Nike's products from the products of others.

24.     As a result of continuous and long-standing promotion, substantial sales, and consumer recognition, Nike has developed powerful trademarks rights, including the marks described in this Section I of the Complaint (collectively, the "Nike Asserted Marks").

25.     Nike maintains strict quality control standards for its products bearing its trademarks.  Genuine Nike products bearing the Nike Asserted Marks are inspected and approved by Nike prior to distribution and sale.

26.     Nike also maintains strict control over the use of its trademarks in connection with its products so that the company can maintain control over its related business reputation and goodwill.  Nike, for example, carefully determines how many products bearing its trademarks are released, where the products are released, when the products are released, and how the products are released.

27.     As part of maintaining control over its brand, Nike has and continues to police and enforce its trademarks against wrongdoers, including "customizers" similar to Defendants.  For example, Nike recently brought suit against MSCHF for trademark infringement and dilution resulting from its sale of the "customized" Satan Shoes.  *See Nike, Inc. v. MSCHF Product Studio, Inc.*, Case No. 1:21-cv-01679-EK-PK, Dkt. 1 (E.D.N.Y. Mar. 29, 2021).  Like Defendants' products, the "Satan Shoes" were "customized" Nike sneakers, bearing Nike's iconic Swoosh design, with several material alterations applied to the sneakers.  Days later, the court granted Nike's application for a temporary restraining order, finding that Nike had shown a likelihood of success as to MSCHF's trademark infringement and dilution.  *Id.*, Dkt. 18 (E.D.N.Y. Apr. 1, 2021).

**A.     Nike's NIKE word mark, Swoosh Design, and Sunburst Mark**

28.     Among Nike's most iconic assets are its NIKE word mark and the Swoosh design.

29.     The U.S. Court of Appeals for the Ninth Circuit has referenced the Nike Swoosh design as an example of a "famous trademark [that has] assumed an exalted status...Consumers sometimes buy products bearing marks such as the Nike Swoosh…for the appeal of the mark itself, without regard to whether it signifies the origin or sponsorship of the product." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1067 (9th Cir. 2006).

30.     Nike adopted the NIKE word mark and Swoosh design in 1971 and since then, has continuously promoted and sold products bearing those marks, including in connection with dozens of iconic products like the ones described in this Complaint.

31.     Nike has also promoted and sold products bearing the NIKE word mark and Swoosh design in various orientations and placements, including in combination with one another. In addition, Nike utilizes its iconic Swoosh design in a repeated pattern as part of a Sunburst Mark.

32.    Nike has sold billions of products bearing the NIKE word mark and Swoosh design in the United States, accounting for hundreds of billions of dollars in revenue.

33.    Nike has spent tens of billions of dollars promoting both NIKE and Swoosh design branded products in the United States.

34.    Nike advertises and promotes products bearing the NIKE word mark and Swoosh design through a wide variety of traditional and non-traditional means, including print advertising, event sponsorship, and athlete and team endorsements, to name a few.

35.    As a result of Nike's promotional and sales efforts over the past nearly fifty years, the NIKE word mark and Swoosh design are among the most famous, recognizable, and valuable trademarks in the world.

36.    The NIKE word mark and Swoosh design have received unsolicited publicity and praise among consumers and in the media.  For example, in 2013, Nike's Swoosh design was ranked number one on Complex Magazine's list of the "Top 50 Most Iconic Brand Logos of All Time."[1]

37.    In addition, the NIKE word mark and Swoosh design have received judicial and administrative recognition as famous, recognizable, and valuable trademarks.

38.    Nike has registered the NIKE word mark on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods and services.  Among others, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| NIKE word marks (Complaint Ex. 1) | | |
| --- | --- | --- |
| Reg. No. | Reg. Date | Goods |
| 0,978,952 | Jan. 31, 1972 | Athletic shoes with or without spikes |

---

[1] Maria Cohen & Morgan Bromell, "The 50 Most Iconic Brand Logos of All Time," *Complex Magazine* (Mar. 7, 2013), *available at*: https://www.complex.com/life/2013/03/the-50-most-iconic-brand-logos-of-all-time/.

| 1,214,930 | Nov. 2, 1982 | Footwear |
|---|---|---|
| 1,243,248 | Jun. 21, 1983 | Retail footwear and apparel store services |
| 2,196,735 | Oct. 13, 1998 | Timepieces of all types, namely, watches and chronographs |
| 6,124,779 | Aug. 11, 2020 | Retail store services and on-line retail store services featuring apparel, footwear, sporting goods and equipment, and sports and fitness products and accessories |

39.    Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 978,952, 1,214,930, 1,243,248, and 2,196,735, are incontestable and constitute conclusive evidence of the validity of the NIKE word mark, Nike's ownership of the NIKE word mark, and Nike's exclusive right to use the NIKE word mark.

40.    Nike also has registered the Swoosh design on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods and services.  Among others, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike Swoosh Designs (Complaint Ex. 2) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 977,190 |  | Jan. 22, 1974 | Athletic shoes with or without spikes |
| 1,264,529 | | Jan. 17, 1984 | Retail footwear and apparel store services |
| 1,323,343 |  | Mar. 5, 1985 | Footwear |
| 2,237,852 | | Aug. 19, 1997 | Watches |
| 1,323,342 |  | Mar. 5, 1985 | Footwear |

| | | | |
|---|---|---|---|
| 1,238,853 |  | May 17, 1983 | Retail footwear and apparel store services |
| 1,325,938 | | Mar. 19, 1985 | Footwear |
| 2,534,358 | | Jan. 29, 2002 | Timepieces of all types, namely, stopwatches |

41.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 977,190, 1,264,529, 1,323,343, 1,990,180, 2,237,852, 1,323,342, 1,238,853, 1,325,938, and 2,534,358 are incontestable and constitute conclusive evidence of the validity of the Swoosh design, Nike's ownership of the Swoosh design, and Nike's exclusive right to use the Swoosh design.

42.     Nike also has registered the Sunburst Mark on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods.  Relevant to this action, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike Sunburst Marks (Complaint Ex. 3) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 3,826,832 |  | Aug. 3, 2010 | Shirts, t-shirts, tank tops, wind resistant jackets, track jackets, pullovers, jackets |
| 3,833,438 |  | Aug. 17, 2010 | Footwear |

43.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 3,826,832 and 3,833,438 are incontestable and constitute conclusive evidence of the validity of the Sunburst Mark, Nike's ownership of the Sunburst Mark, and Nike's exclusive right to use the Sunburst Mark.

**B.**    **Nike's JUST DO IT mark**

44.    Nike debuted the JUST DO IT campaign in 1988.

45.    Succinctly capturing the tough, sportsmanlike spirit embodied by Nike and its products, the JUST DO IT tagline became an instant hit, and the JUST DO IT mark was quickly adopted as a core component of Nike's brand.

46.    Since that time, Nike has sold tens of millions of dollars of merchandise with the JUST DO IT mark.

47.    Nike has spent hundreds of millions of dollars advertising and promoting its merchandise using the JUST DO IT mark, often in connection with the signature Swoosh design. The JUST DO IT mark has been used in a wide array of media, including billboards, television commercials, print media ads, and even graffiti art.

48.    Over the years, Nike has enlisted a wide range of athletes, from NBA stars Michael Jordan and LeBron James to tennis greats Serena Williams and Rafael Nadal to golf star Tiger Woods, for ads bearing the JUST DO IT mark.

49.    As a result of Nike's extensive sales, advertising, and promotion, the JUST DO IT mark has become famous in the United States and the around the world.  It is among the most famous, recognizable, and valuable trademarks.

50.    The JUST DO IT mark has received widespread acclaim and publicity.  As one article noted on the 25th anniversary of the slogan's release, JUST DO IT "has achieved what companies hope for -- a quick line that becomes so well-known it works its way into pop culture. . . . 'When you say 'Just Do It,' it is very clear what it represents.'"[2]

---

[2] Jeffrey Martin, "After 25 years, 'Just Do It' remains iconic tagline," USA Today Sports (Aug. 21, 2013), *available at*: https://www.usatoday.com/story/sports/nba/2013/08/20/nike-just-do-it-turns-25/2679337/.

51.     The JUST DO IT mark has received judicial and administrative recognition as a famous, recognizable, and valuable trademark.

52.     Nike has registered the JUST DO IT mark on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods and services.   Among others, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike JUST DO IT Marks (Complaint Ex. 4) | | |
|---|---|---|
| Reg. No. | Reg. Date | Goods |
| 1,875,307 | Jan. 24, 1995 | Athletic shoes with or without spikes |
| 4,764,071 | June 20, 2015 | All-purpose sport bags; backpacks. footwear; headbands; headwear; pants; shorts; sports bras; tank tops; tights; warm up suits |
| 5,727,940 | Apr. 16, 2019 | Retail store services and online retail store service featuring apparel, footwear, sporting goods and equipment, and sports and fitness products and accessories |

53.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration No. 1,875,307, is incontestable and constitutes conclusive evidence of the validity of the JUST DO IT mark, Nike's ownership of the JUST DO IT mark, and Nike's exclusive right to use the JUST DO IT mark.

**C.     Nike's ACG design**

54.     Nike debuted its ACG, short for "All Conditions Gear," line in 1989 to focus on innovative athletic apparel and sporting gear for all climates.

55.     In connection with its ACG line, Nike has registered the ACG design on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods.   Relevant to this action, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike ACG Marks (Complaint Ex. 5) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 2,117,273 | ACG NIKE | Dec. 2, 1997 | Footwear |

56.    Nike launched the ACG brand in 1989, and Nike has continuously and substantially exclusively used the ACG mark and promoted and sold footwear bearing the ACG mark for many years.

57.    Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration No. 2,117,273 is incontestable and constitutes conclusive evidence of the validity of the ACG mark, Nike's ownership of the ACG word mark, and Nike's exclusive right to use the ACG mark.

D.    Nike's DUNK word mark and Dunk trade dress

### The Nike Dunk Shoe



58.    The Nike Dunk sneaker began as a basketball shoe in the 1980s.

59.    Nike introduced the Dunk sneaker in 1986 in connection with its College Colors Program.  College basketball players had typically worn single color shoes (e.g., white or black). But Nike's College Colors Program offered schools the opportunity to have shoes that mirrored

their school colors.  Nike's original "Be True to Your School" advertisement for its College Colors
Program is reproduced below.



60.     Nike's College Colors Program became wildly popular. At that time in the 1980s,
college basketball was reaching new heights among a wide age range of athletes and fans.  From
east to west, rivalries were strong and network TV brought college hoops, and Nike's Dunk
sneakers, to the masses.

61.     The Dunk sneaker's adoption and popularity eventually spread beyond basketball
culture as the skateboard community organically adopted the Dunk sneaker making it a skate icon
by the 2000s.  From there, the Dunk sneaker crossed over sports and fashion, and today it is
recognized as one of the most iconic and influential sneakers of all time.

62.     Nike drove the iconic status the Dunk sneaker enjoys today, in part, through
limited-edition collaborations with designers, artists, and other creatives.  For example, in 2005,

Nike collaborated with Jeff Staple, Founder and Creative Director of Staple Design and Reed Space, to create the limited-edition Nike SB Dunk Low NYC Pigeon.

63.    Nike released 150 pairs of the Nike SB Dunk Low NYC Pigeon at Reed Space's New York storefront.  A large crowd camped out hoping to get a pair, the New York City Police were called, and the release made the cover of the New York Post. The event paved the way for today's sneaker culture.  In fact, the Nike SB Dunk Low NYC Pigeon has been referred to as the "sneaker that started it all," ultimately declaring the birth of sneaker culture.

64.    Over the years, Nike has released numerous Dunk sneaker collaborations.  For example, Nike recently released the Nike SB Dunk Low Grateful Dead versions, which feature the Grateful Dead's dancing bear logo on the tongue and bear-inspired detailing like faux-fur and suede.  Nike also recently released a Dunk sneaker collaboration with ice cream company Ben & Jerry's called the Chunky Dunky.  The special edition used the blue sky, green pastures, and cow-print patterns from Ben & Jerry's signature packaging and added ice cream drip details to the Swoosh design to create a playful iteration of the Dunk sneaker.  These collaborations, both released last year, sell on the secondary market for over ten times their original price.

65.    Since the launch of the Dunk sneaker in 1986, Nike has continuously and substantially exclusively used the DUNK word mark and promoted and sold sneakers bearing the Dunk trade dress.

66.    Nike has sold tens of millions of Dunk sneakers in the United States, accounting for hundreds of millions of dollars in revenue.

67.    As a result of Nike's extensive sales, advertising, and promotion, the DUNK word mark has become famous in the United States and the around the world.

68.     Nike has also registered the DUNK word mark and the Dunk sneaker trade dress on the Principal Register of the U.S. Patent and Trademark Office.  Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike Dunk Marks (Complaint Ex. 6) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 3,780,236 | DUNK | Apr. 27, 2010 | Footwear |
| 3,711,303 |  | Nov. 17, 2009 | Footwear |
| 3,711,305 |  | Nov. 17, 2009 | Footwear |
| 3,721,064 |  | Dec. 8, 2009 | Footwear |

69.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 3,780,236, 3,711,303, 3,711,305, and 3,721,064 are incontestable and constitute conclusive evidence of the validity of the DUNK word mark and the Dunk sneaker trade dress, Nike's ownership of the DUNK word mark and the Dunk sneaker trade dress, and Nike's exclusive right to use the DUNK word mark and the Dunk sneaker trade dress.

### E.    Nike's AIR FORCE 1 word mark and Air Force 1 trade dress

**The Nike Air Force 1 Shoe**



70.    Nike released its Air Force 1 sneaker in 1982.

71.    The first Nike basketball shoes to feature the Nike Air technology, the Air Force 1 shoes were worn by some of the NBA's most high-profile players of the era, including the "Original Six": Michael Cooper, Bobby Jones, Moses Malone, Calvin Natt, Mychal Thompsen and Jammal Wilkes.  Nike's original Air Force 1 advertisement featuring the "Original Six" is reproduced below.



72.    Although Nike initially discontinued the Air Force 1 shoes in 1984, demand for the wildly-popular sneakers continued to soar.  Just one year later, the Air Force 1 shoes returned to the market because fans demanded it.

COMPLAINT - Page 19

73.     Within just a few years, the popularity of the Air Force 1 shoes exploded off the basketball court too, and the shoe became a favorite of city youth up and down the East Coast.

74.     The cachet of owning Air Force 1 shoes was driven in part by Nike's strategy for releasing new color combinations of the shoe.  During the late 1980's and early 1990's, Nike sold the Air Force 1 shoes through hand-selected retail stores instead of its regular catalogue.  New "drops" of the Air Force 1 shoes sold out immediately and became highly coveted items among sneaker enthusiasts.

75.     In the 2000s, globally recognized artists such as Nelly and Jay-Z further solidified the Air Force 1 shoes in popular culture, referencing the shoes in their lyrics and releasing limited edition collaborations with their albums.  The Air Force 1 shoes' growing popularity among globally influential celebrities and music artists propelled it farther beyond sport and into culture.  Nike continued to collaborate with various designers to create much-anticipated limited edition Air Force 1 styles and colorways.  These collaborations and limited-run releases gave the Air Force 1 shoes a coveted level of prestige and helped spread its gospel to new generations and demographics.

76.     Nearly 40 years after its debut, the Nike Air Force 1 shoe has been produced in over 1,700 color combinations, including numerous limited, special, and premium editions.  The Air Force 1 shoe remains incredibly popular and has maintained sales in excess of 800 million dollars per year.

77.     Consumers looking for a specific style or colorway of Air Force 1 shoes are not limited to the thousands of colorways featured on past Air Force 1 shoes, however.  In the mid-2000s, Nike created NikeiD, which turned consumers into their own collaborators by allowing

customization of virtually every aspect of the shoes while at the same time ensuring the high-quality of the sneaker and its materials that consumers had come to expect from Nike products.

78.    Today, customers can create their own custom Air Force 1 shoes directly on Nike's website through Nike's "Design Your Own" feature.  This feature allows customers to choose the color of thirteen (13) different portions of the Air Force 1 shoes, and further gives the consumer the option of choosing between various types of high-quality leathers and rubbers.  By offering the "Design Your Own" feature, Nike offers customers an opportunity to customize Air Force 1 shoes while maintaining control over the design process to ensure that the quality of the customized designs meets Nike's rigorous quality control standards.

79.    For several decades, Nike continuously and substantially exclusively used the AIR FORCE 1 word mark and promoted and sold sneakers bearing the Air Force 1 trade dress.

80.    Nike has sold tens of millions of Air Force 1 shoes in the United States, accounting for hundreds of millions of dollars in revenue.

81.    As a result of Nike's extensive sales, advertising, and promotion, the AIR FORCE 1 word mark has become famous in the United States and the around the world.

82.    Nike has registered the AIR FORCE 1 word mark and the Air Force 1 trade dress on the Principal Register of the U.S. Patent and Trademark Office.  Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike Air Force 1 Marks (Complaint Ex. 7) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 3,520,484 | AIR FORCE 1 | Oct. 21, 2008 | Footwear |
| 3,451,904 |  | Jun. 24, 2008 | Footwear |
| 3,451,905 |  | Jun. 24, 2008 | Footwear |
| 3,451,906 |  | Jun. 24, 2008 | Footwear |
| 3,451,907 |  | Jun. 24, 2008 | Footwear |
| 5,820,374 |  | Jul. 30, 2019 | Footwear |

83.    Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 3,451,904, 3,451,905, 3,451,906, and 3,451,907 are incontestable and constitute conclusive evidence of the validity of the AIR FORCE 1 word mark and the Air Force 1 trade dress, Nike's ownership of the AIR FORCE 1 word mark and the Air Force 1 trade dress, and Nike's exclusive right to use the AIR FORCE 1 word mark and the Air Force 1 trade dress.

**F.    Nike's Jordan Brand marks**

84.    In 1984, Nike signed a contract with then-NBA rookie Michael Jordan, who went on to become one of the most popular and internationally recognized players in basketball.  In the

decades since, Nike's partnership with Jordan has led to numerous Jordan Brand products, including the stalwart line of Air Jordan basketball shoes, and has generated some of the most recognized and quintessential indicators of Nike products.

85.    Nike produced the first Air Jordan shoe in late 1984.  The early version immediately gained notoriety after then-NBA Commissioner David Stern outlawed the shoe and fined Jordan each time he wore them in a game.

### The Air Jordan Shoe

 

86.    The Air Jordan I was released to the public in the Spring of 1985 and became an instant hit.  Sales of the Air Jordan I topped 50 million dollars in the first month alone and exceeded 100 million dollars by the end of the year.

87.    Throughout Jordan's prolific NBA career, basketball fans everywhere wanted to "Be Like Mike" and wear the Air Jordan.  Even after Jordan's retirement, the Air Jordan has remained the preeminent basketball shoe.  The line comprised over half of all basketball shoe sales in the United States in 2012 and over three-quarters of youth basketball shoe sales that year.

88.    The Air Jordan also has featured prominently in popular culture.  Director Spike Lee showcased the shoe in the 1989 film *Do the Right Thing*.  Will Smith's character on the hit TV show *The Fresh Prince of Bel-Air* wore Air Jordans during numerous episodes.  Jordan, of course, wore the shoe in his hit 1996 film *Space Jam*.

89.     In recent years, Nike has released Air Jordan collaborations with artists like Travis Scott and fashion designers like Louis Vuitton's Virgil Abloh and Anna Wintour of Vogue.

90.     For over 30 years, Nike has continuously and substantially exclusively used the AIR JORDAN word mark and promoted and sold sneakers bearing the Air Jordan trade dress.

91.     Nike has sold many tens of millions of Air Jordan shoes in the United States, accounting for billions of dollars in revenue.

92.     As a result of Nike's extensive sales, advertising, and promotion, the AIR JORDAN word mark has become famous in the United States and the around the world.

93.     Nike has registered the AIR JORDAN word mark and the Air Force 1 trade dress on the Principal Register of the U.S. Patent and Trademark Office. Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike Air Jordan Marks (Complaint Ex. 8) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 1,370,283 | AIR JORDAN | Nov. 12, 1985 | Footwear and athletic clothing |
| 6,368,691 |  | June 1, 2021 | Footwear |
| 6,368,694 |  | June 1, 2021 | Footwear |
| 6,368,693 |  | June 1, 2021 | Footwear |

94.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration No. 1,370,283 is incontestable and constitutes conclusive evidence of the validity of the AIR JORDAN word mark, Nike's ownership of the AIR JORDAN word mark, and Nike's exclusive right to use the AIR JORDAN word mark.

95.     Nike's partnership with Jordan also has led to other longstanding marks now associated with the Nike Jordan brand.  The outside ankle of the original Air Jordan shoe bore an Air Jordan Wings logo that had been specially crafted for the Jordan-inspired model.  The Air Jordan Wings design continues to be a key detail on the Air Jordan's, featuring prominently on the front of the Air Jordan XXXII, released in 2017, and on retro re-releases and designer collaborations.

96.     Nike also has registered the Air Jordan Wings design on the Principal Register of the U.S. Patent and Trademark Office.  Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike Air Jordan Wings Mark (Complaint Ex. 9) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 3,725,535 |  | Dec. 15, 2009 | Footwear; apparel, namely, shirts, pants, shorts; jackets, hats; sweatshirts |

97.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration No. 3,725,535 is incontestable and constitute conclusive evidence of the validity of the Air Jordan Wings design, Nike's ownership of the Air Jordan Wings design, and Nike's exclusive right to use the Air Jordan Wings design.

98.     The packaging for the original Air Jordan release featured a photograph of Jordan midair, legs in a ballet jete, and arm outstretched reaching for a slam dunk.  The silhouette of that pose became the iconic Jumpman design mark, which Nike has continuously and substantially used since 1988.

99.     The Jumpman design and related JUMPMAN word mark are immensely valuable, with sales of Jordan Brand products bearing those marks topping 3 billion dollars annually.

100.    Nike advertises and promotes products bearing the Jumpman design through athlete and team endorsements, traditional print ads, online, and through other media.  For example, the statement uniforms (alternative jerseys worn for big games or rivalry matchups) for the 2020-2021 NBA season feature the Jumpman logo on the right shoulder of the jersey and left leg of the shorts.

101.    As a result of Nike's promotional and sales efforts, the Jumpman design and JUMPMAN wordmark are instantly recognizable emblems of Nike's Jordan Brand products.  In fact, on its 30th anniversary in 2018, ESPN described the Jumpman design as "the most famous athlete logo of all time."[3]

102.    Nike has continuously and substantially exclusively used the Jumpman design and JUMPMAN word mark for nearly 30 years.

103.    As a result of Nike's extensive sales, advertising, and promotion, the JUMPMAN word mark and Jumpman design have become famous in the United States and the around the world.

104.    Nike also has registered the JUMPMAN word mark, and Jumpman design on the Principal Register of the U.S. Patent and Trademark Office.  Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike JUMPMAN Marks (Complaint Ex. 10) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 3,627,820 | JUMPMAN | May 26, 2009 | Footwear; apparel, namely, pants, shorts, shirts, t-shirts, sweatshirts, sweatpants, jackets, socks, caps, hats |
| 1,558,100 | | Sept. 26, 1989 | Footwear, t-shirts, shorts, pullovers, |

---

[3] *See* Darren Rovell, "Jumpman at 30: The story behind the most famous athlete logo in sports," ESPN.com (Sept. 26, 2018), *available at*: https://www.espn.com/nba/story/_/id/24721980/path-michael-jordan-logo.

| | | | pants, warm-up suits and tank tops |
|---|---|---|---|
| 1,742,019 | | Dec. 22, 1992 | All-purpose sports bags and backpacks; footwear and clothing, namely pants, shorts, shirts, t-shirts, sweatshirts, tank tops, warm-up suits, jackets, hats, caps, and socks |

105.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 3,627,820, and 1,558,100 are incontestable and constitute conclusive evidence of the validity of the Air Jordan Wings design, the JUMPMAN word mark, and Jumpman design, Nike's ownership of the Air Jordan Wings design, the JUMPMAN word mark, and Jumpman design, and Nike's exclusive right to use the Air Jordan Wings design, the JUMPMAN word mark, and Jumpman design.

106.     Moreover, as a result Nike's extensive, sales, advertising, and promotion of Air Jordan I shoes, the three-dimensional form and configuration of the high top and low top versions of Air Jordan I shoes have come to serve as source identifiers for Nike.

107.     Additional examples of the Air Jordan I trade dress are pictured below.







**G.      Nike's Elephant Print design**

108.    In 1988, in conjunction with the release of the Air Jordan III, Nike introduced a
grey and black pattern known as the "Elephant Print" design.  The Elephant Print design has since
been continuously used on a wide array of Nike products.

109.    Nike has registered the Elephant Print design on the Principal Register of the U.S.
Patent and Trademark Office in connection with a wide array of goods.  Relevant to this action,
Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Nike Elephant Print Mark (Complaint Ex. 11) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 4,137,741 |  | May 8, 2012 | Backpacks, drawstring pouches, duffle bags; footwear, headwear, headbands, socks, t-shirts, shirts, tank tops, polo shirts, pants, shorts, jeans, jackets, coats, wind resistant jackets, jerseys, blazers, track jackets, sweat pants, sweat shirts, scarves, fleece tops |

110.    Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 4,137,741 is incontestable and constitute conclusive evidence of the validity of the Elephant Print design mark, Nike's ownership of the Elephant Print design mark, and Nike's exclusive right to use the Elephant Print design mark.

## II.    CONVERSE

111.    Converse was founded in 1908 as a rubber shoe company.  Converse eventually expanded to producing athletic shoes and then casual footwear.  Today, Converse manufacturers, designs, and sells a wide range of products, including shirts, pants, jackets, bags, hats, and backpacks.

112.    Converse sells its products directly to consumers through Converse-owned retail stores and digital platforms, and to retails stores in the United States and over 50 international markets.

113.    Converse uses trademarks on nearly all of its products, including the marks described in this Section II of the Complaint (collectively, "the Converse Asserted Marks" and together with the Nike Asserted Marks, "Plaintiffs' Asserted Marks").

114.    Having distinctive trademarks that are readily identifiable is an important factor in creating a market for Converse's products, in identifying Converse and its brands, and in distinguishing Converse's products from the products of others.

115.    As a result of continuous and long-standing promotion, substantial sales, and consumer recognition, Converse has developed powerful trademarks rights, including those described herein.

116.    Converse maintains strict quality control standards for its products bearing its trademarks.  Genuine Converse products bearing the Converse marks are inspected and approved by Converse prior to distribution and sale.

117.    Converse also maintains strict control over the use of its trademarks in connection with its products so that the company can maintain control over its related business reputation and goodwill.

**A.    Converse's Chuck Taylor All Star marks**

**The Converse Chuck Taylor All Star Shoe**

 

118.    In about 1917, Converse introduced a high-top basketball shoe that would eventually be named the Converse "Chuck Taylor All Star" shoe.  Converse has continuously sold shoes under the Chuck Taylor All Star name and bearing the Chuck Taylor All Star midsole design in United States commerce since at least 1946.  Around 1962, Converse introduced a low-cut version of the shoes that used the same Chuck Taylor All Star midsole design as the high-top

version.  The outsole design is the same on the high and low styles and has been continuously used in connection with those shoe designs by Converse since their introduction into U.S. commerce. The appearance of Converse's Chuck Taylor All Star shoe designs, including the midsole and outsole designs are collectively referred to as the "Chuck Taylor Trade Dress."

119.    Converse has sold shoes bearing the Chuck Taylor Trade Dress throughout the world and in every state of the United States for over a century.  Converse sells shoes bearing the Chuck Taylor Trade Dress through its own retail stores, on the Internet, and through a wide variety of retailers including, for example, Nordstrom, Kohl's, JC Penney, Foot Locker, Saks Fifth Avenue, and independent shoe retailers of all sizes throughout the country.

120.    Over the past decade, Converse sold hundreds of millions of pairs of shoes bearing the Chuck Taylor Trade Dress throughout the United States, and those sales earned Converse billions in gross U.S. revenue.  Since the introduction of the Chuck Taylor Trade Dress, Converse estimates that worldwide it has sold over a billion pairs of shoes bearing the Chuck Taylor Trade Dress.

121.    Converse has a long history of advertising and promoting the Chuck Taylor Trade Dress, including in print, on the Internet, on billboards, in videos, and at retail.  Converse has spent hundreds of millions advertising and promoting the Chuck Taylor Trade Dress.

122.    The Chuck Taylor Trade Dress is also the subject of unsolicited public attention. The Chuck Taylor Trade Dress is the subject of books, including *Chucks!: The Phenomenon of Converse Chuck Taylor All Stars*, and *Chuck Taylor, All Star*, where the Chuck Taylor Trade Dress is described as an icon of American footwear and the most famous athletic shoe in history.  The Chuck Taylor Trade Dress has been featured in newspaper and magazine articles, including a March 2008 article in *The New Orleans Times-Picayune* celebrating the 100th anniversary of

Converse, where the Chuck Taylor Trade Dress is described as being essentially the same for seventy-five years.

123.    The Chuck Taylor Trade Dress is the focus of Internet chatter and fan sites such as chucksconnection.com that celebrate the designs and their presence throughout American culture.

124.    Shoes bearing the Chuck Taylor Trade Dress regularly appear in movies and in television shows and are often seen being worn by celebrities and musicians.  Recently, the Chuck Taylor Trade Dress has received attention as the go-to footwear of Vice President Kamala Harris, who wore them at rallies and even on the cover of Vogue.

125.     Pop culture icons, music groups, and companies from all genres—including John Lennon, Kurt Cobain, John Varvatos, Metallica, and DC Comics, to name a few—have collaborated with Converse on special releases of shoes bearing the Chuck Taylor Trade Dress.

126.    The Chuck Taylor Trade Dress has become one of the most recognizable, enduring, and iconic casual athletic shoe designs in history.  As a result of Converse's long-standing use, advertising, and sales of shoes bearing the Chuck Taylor Trade Dress, and the widespread publicity and attention that has been paid to it, the Chuck Taylor Trade Dress is famous and consumers have come to associate it with Converse.

127.    In addition to the Chuck Taylor Trade Dress, Converse has used and promoted a Chuck Taylor All Star Patch, Chuck Taylor License Plate design, and All Star designs in connection with its Chuck Taylor shoes for many years.

128.    As a result of Converse's long and substantial use and promotion of products bearing the All Star Patch mark, consumers have come to associate these marks with Converse and the Chuck Taylor All Star.

129.    Over the years, Converse has used its Chuck Taylor All Star Patch mark in connection with its sales and promotion of shoes bearing the Chuck Taylor Trade Dress described above and other clothing and accessories.  For example, the Converse Chuck Taylor All Star high top design often bear the mark of the outside ankle of each shoe.  The Chuck Taylor All Star Patch mark also features prominently on the lower pouch of many of Converse's backpacks.

130.    As a result of Converse's continuous and exclusive use of the Chuck Taylor All Star Patch mark, Converse's substantial marketing and promotion efforts related to this mark, and Converse's substantial sales made in connection with these marks, Converse's Chuck Taylor All Star Patch mark are famous and consumers have come to associate them as source identifiers of Converse.

131.    Converse has registered the Converse Asserted Marks on the Principal Register of the U.S. Patent and Trademark Office.  Converse owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Converse Marks (Complaint Ex. 12) | | | |
|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods |
| 868,375 | CONVERSE | Apr. 22, 1969 | Clothing-namely, industrial boots, rubber boots, tennis shoes, basketball shoes, boat shoes, general purpose athletic sneakers, casual shoes |
| 3,175,430 | | Nov. 21, 2006 | Retail store services featuring footwear, clothing, sports bags, and book bags |
| 3,534,741 | CHUCK TAYLOR | Nov. 18, 2008 | Footwear; clothing, namely, t-shirts, tank tops and sweatshirts, headgear, namely, sports caps and knit caps |

| 369,971 | ALL STAR | Aug. 8, 1939 | Athletic shoes of rubber and fabric |
|---|---|---|---|
| 2,807,854 | | Jan. 27, 2004 | Footwear |
| 4,398,753 |  | Sept. 10, 2013 | Footwear |
| 1,588,960 |  | Mar. 27, 1990 | Athletic Footwear |
| 3,258,103 |  | Jul. 3, 2007 | Footwear |
| 1,138,469 |  | Aug. 5, 1980 | Footwear |
| 2,098,296 |  | Sept. 16, 1997 | Athletic footwear |
| 1,146,876 |  | Feb. 10, 1981 | Footwear |

132.    Pursuant to 15 U.S.C. § 1065, Converse's U.S. Trademark Registration Nos. 868,375, 3,175,430, 3,534,741, 369,971, and 2,807,854, are incontestable and constitute conclusive evidence of the validity of the CONVERSE, CHUCK TAYLOR, and ALL STAR word

COMPLAINT - Page 34

marks, Converse's ownership of the CONVERSE, CHUCK TAYLOR, and ALL STAR word marks, and Converse's exclusive right to use the CONVERSE, CHUCK TAYLOR, and ALL STAR word marks.

133.    Likewise, pursuant to 15 U.S.C. § 1065, Converse's U.S. Trademark Registration Nos. 1,588,960, 3,258,103, and 4,398,753 are incontestable and constitute conclusive evidence of the validity of the Chuck Taylor Trade Dress, Converse's ownership of the Chuck Taylor Trade Dress, and Converse's exclusive right to use the Chuck Taylor Trade Dress.  Converse has also obtained a General Exclusion Order from the International Trade Commission prohibiting the unlicensed entry of all footwear products that infringe Converse's U.S. Trademark Registration Nos. 1,588,960, 3,258,103, and/or 4,398,753.

134.    Further, pursuant to 15 U.S.C. § 1065, Converse's U.S. Trademark Registration Nos. 1,138,469, 2,098,296, and 1,146,876 are incontestable and constitute conclusive evidence of the validity of the Converse All Star Patch, Chuck Taylor License Plate design, and All Star marks, Converse's ownership of the Converse All Star Patch, Chuck Taylor License Plate design, and All Star marks, and Converse's exclusive right to use the Converse All Star Patch, Chuck Taylor License Plate design, and All Star marks.

### III.    DEFENDANTS' UNLAWFUL ACTIVITIES

135.    Without Plaintiffs' authorization, Defendants have manufactured, promoted, advertised, and sold "customized" footwear, footwear patterns, and accessories bearing the Nike Asserted Marks, the Converse Asserted Marks, and/or confusingly similar marks (the "Infringing Products"). The Infringing Products manufactured, promoted, advertised, and sold by Defendants have not been authorized by Plaintiffs, nor are Defendants affiliated with or sponsored, endorsed, or approved by Plaintiffs in any way.

136.    On information and belief, Defendants create "customized" footwear by acquiring genuine Nike and Converse footwear from popular styles, including the Air Jordan 1 and Air Force 1, and the Chuck Taylor All Star, and then, without Plaintiffs' authorization, altering them in such a manner that they constitute new, unauthorized products.  The materially altered shoes are then offered for sale to the general public with original Nike and Converse Asserted Marks remaining intact.

137.    For example, Defendants' website offers the "Custom Prime Nike Air Jordan 1" shoes depicted below, which Defendants explain are manufactured from a "base pair" of Air Jordan 1 shoes bearing the Swoosh design and Air Jordan 1 Trade Dress.  The base pair is then altered with "[f]ull custom leather lined tongues made from Amazon Prime bubble mailer packaging with actual barcodes and QR codes from the packaging [that] are sewn into the shoes." Further, metal eyelets are added to the eye-stays and the shoes are painted with Amazon logo and other material.



138.    Such alterations of genuine Nike and Converse shoes are likely to cause confusion as to Plaintiffs' approval of the goods, including confusion that Plaintiffs have collaborated with other brands.  Defendants' alterations to Plaintiffs' genuine shoe parts also may affect the integrity

of the "customized" shoes, which Nike and Converse have not been able to inspect and evaluate against their stringent design and manufacturing standards.  Given the active secondary market for Nike and Converse products, in particular Plaintiffs' limited releases and collaborations, the likelihood of downstream confusion from Defendants' unauthorized "customizations" runs especially high.

139.    Additional examples of Defendants' Infringing Products from Defendants' Footwear "collection" are pictured below next to the Nike Asserted Marks and the Converse Asserted Marks.

| Comparison of Plaintiffs' Trademarks with Defendants' "Customized" Footwear | |
|---|---|
| **Plaintiffs' Asserted Trademarks** | **Defendants' Infringing Products** |
| NIKE<br><br>AIR JORDAN<br><br> | **Custom Postal Nike Air Jordan 1**<br><br> |



NIKE

AIR JORDAN

**Custom Prime Nike Air Jordan 1**

NIKE

AIR JORDAN

**Custom Terra Nike Air Jordan 1**



| CONVERSE ALL STAR CHUCK TAYLOR | Custom Sashiko Hand Stitched Recycled Denim Converse All Star |
|---|---|
|  |   |

140.    Defendants also make and sell laser cut and digital download "shoe patterns" that can be used to create different sizes of several of Nike's iconic and trade-dress protected footwear styles, including the Air Force 1, the Dunk, and the Air Jordan 1.  According to Defendants, the patterns (pictured below) provide "all necessary shapes for each upper piece, the lining,

reinforcements, foams, and heel counter" to allow users to start "making [their] very own custom pair" of Nike shoes.



141.    Examples of Infringing Products from Defendants' Footwear Patterns "collection" are pictured below next to the Nike Asserted Marks and the Converse Asserted Marks.

| Comparison of Plaintiffs' Trademarks with Defendants' Footwear Patterns | |
| --- | --- |
| Plaintiffs' Asserted Trademarks | Defendants' Infringing Products |
| NIKE<br><br>DUNK<br><br> | **Nike SB Dunk High Shoe Pattern**<br><br> |
| NIKE<br><br>DUNK<br><br> | **Nike SB Dunk Low Shoe Pattern**<br><br> |





| NIKE | Nike Air Jordan 1 Low Shoe Pattern |
| --- | --- |

142.    On information and belief, Defendants' customers purchase these patterns to make their own unauthorized Nike uppers bearing the famous Swoosh design and other protected trade dress.  These unauthorized shoes are likely to cause confusion by those viewing the footwear on the wearer or if those shoes are later sold as authentic Nike products.   Unlike with Nike's authorized releases and approved "Nike By You" customizations, Nike has no control over the colorways, materials, or other logos used in the shoes made from Defendants' shoe patterns.  Thus, the likelihood of confusion and mistake engendered by the "custom" shoes made from these templates causes irreparable harm to the goodwill symbolized by Nike's Swoosh design and Nike protected trade dress.

143.    In addition to footwear and footwear patterns, Defendants sell clocks and stools that prominently feature Nike's and Converse's famous marks.  Defendants' Accessories are not genuine Nike or Converse products. Plaintiffs did not manufacture or inspect the Infringing Products, and they did not authorize Defendants to make, promote, advertise, market, or sell the Infringing Products bearing their Asserted Marks.

144.   Examples of Infringing Products from Defendants' accessories "collection" are pictured below next to the Nike Asserted Marks and the Converse Asserted Marks.

| Comparison of Plaintiffs' Trademarks with Defendants' Accessories | |
|---|---|
| **Plaintiffs' Asserted Trademarks** | **Defendants' Infringing Products** |
| NIKE  | **Classic Logo Deck Clock**  |
| NIKE  | **Pinwheel Logo Desk Clock**  |
| NIKE  | **ACG Wall Clock**  |



**Elephant Print Deck Clock**

NIKE

JUST DO IT

**Just Do it Sneaker Stool**



145.    Defendants' use of identical or confusingly similar imitations of Plaintiffs' Asserted Marks on these Infringing Products is likely to confuse and mislead prospective purchasers, purchasers, and those viewing the accessories after sale—for example those who receive the products as a gift—that the products are manufactured or authorized by Plaintiffs, which they are not.

146.    Defendants promote, distribute, offer to sell, and sell their "customized" footwear, footwear patterns, accessories, and other products, including the Infringing Products, directly to

end customers through their website GetKickRich.com, which reaches into the United States and this judicial district.  A screenshot from Defendants' website is shown below.



147.    Defendants also promote and offer to sell, their "customized" footwear, footwear patterns, accessories, and other products, including the Infringing Products, directly to end customers through their Instagram and Facebook pages, and third-party sites such as Etsy.com, which reach into the United States and this judicial district.  A screenshot from Defendants' Etsy shop page is shown below.



148.    Without Plaintiffs' authorization, Defendants use Plaintiffs' Asserted Marks to promote and sell the Infringing Products through their website and Etsy page.  Defendants' use of infringing marks in connection with the Infringing Products improperly creates associations with Plaintiffs.

149.    Examples of materials used by Defendants to market and sell their Infringing Products are pictured below.



Custom TERRA Nike Air Jordan 1- Origins Collection

$2,500.00



## Nike SB Dunk High Shoe Pattern - Laser Cut

$375.00 ~~$400.00~~



## Nike Air Force 1 Low Shoe Pattern - Laser Cut

$375.00 $400.00



get.kickrich • Follow
Portland, Oregon

.
.
#kicksology #kickstagram #sneakerheads #sneakerholics #hypebeast #complexkicks #ShoesSoFresh #BecauseSneakers #SNKRSKickCheck #KicksOnFire #NiceKicks #HypebeastSneakers #ComplexSneakers #Sneakers #HSKicks #Nike #Sneakerfiles #BrKicks #CreateAtHome #Design #Art #uppersneakers #sneakerfreakerfam #DIY #Minimalmovement #igsneakercommunity #instakicks #justdoit #stools #handmade

23w

**akraamaham** Clean craftsmanship 🔥👏👏

23w 2 likes Reply

153 likes

NOVEMBER 3, 2020

Add a comment... Post

get.kickrich • Follow
Portland, Oregon

20w

**get.kickrich** #converseaddict #converse #converseallstar #conversechucktaylor #sneakerfiles #complexkicks #hypebeastkicks #complex #complexsneakers #wdywt #nicekicks #brkicks #highsnobiety #sneakernews #nike #kicksonfire #sneakerfreakerfam #solecollector #hskicks #snrkinc #hypebeast #createathome #sneakersbr #crepecity #kickstagram #igneakercommunity #instakicks #sneakerhead #sneakerholics #sneakerporn

20w Reply

47 likes

NOVEMBER 24, 2020

Add a comment... Post

150.    The above are mere examples of Defendants' infringing uses and other instances of unlawful infringement abound.  Indeed, nearly every post on Defendants' Instagram, which links to the GetKickRich.com website and encourages users to "Click the link in bio to shop," uses Plaintiffs' mark.



151.    Defendants have created confusion in the marketplace by, among other things, using Plaintiffs' Asserted Marks and advertising their Infringing Products as including Plaintiffs' "classic" or "vintage" logos and slogans.  In particular, Defendants use references to Defendant Waskowiak's prior employment, which suggests authorization by Plaintiffs.

152.    Defendants' Infringing Products travel in the identical channels of trades and are sold to identical consumers as Plaintiffs' genuine products bearing the same or similar marks. Defendants have, in fact, sold these Infringing Products, including to consumers in the United States.

153.    Defendants' Infringing Products also will be seen on wearers and users or potentially in the secondary market by consumers looking to purchase authentic Nike and Converse products.  Observers of the Infringing Products and the footwear made using the Infringing Products are likely to mistakenly attribute the Infringing Products and fakes made with Defendants' patterns to Plaintiffs.

154.    By virtue of the acts complained of herein, Defendants have created a likelihood of injury to Plaintiffs' business reputation and goodwill, caused a likelihood of consumer confusion, mistake, and deception as to the source of origin or relationship of Plaintiffs' products and Defendants' Infringing Products, and have otherwise competed unfairly by unlawfully trading on and using Plaintiffs' Asserted Marks without Plaintiffs' permission.

155.    Unless stopped, Defendants' Infringing Products and Defendants' use of Plaintiffs' Asserted Marks will continue to cause confusion in the marketplace, including but not limited to initial interest confusion, post-sale confusion, and confusion in the secondary sneakers markets.

156.    Defendants' acts complained of herein have caused damage to Plaintiffs in an amount to be determined at trial, and such damages will continue to increase unless Defendants are permanently enjoined from their wrongful acts.

157.    Defendants' acts complained of herein have caused Plaintiffs to suffer irreparable injury to its business. Plaintiff will suffer substantial loss of goodwill and reputation unless and until Defendants are permanently enjoined from the wrongful acts complained of herein.

### COUNT I: TRADEMARK INFRINGEMENT
### IN VIOLATION OF 15 U.S.C. § 1114

158.    Plaintiffs repeat and allege each and every allegation of paragraphs 1 through __, above, as though fully set forth herein.

159.    Defendants have knowingly used and continue to use in commerce, without Plaintiffs' permission or authorization, Plaintiffs' registered Asserted Marks, and/or confusingly similar marks, in connection with products manufactured, advertised, promoted, and sold in the United States, including the Infringing Products. Defendants have used Plaintiffs' registered Asserted Marks with the knowledge of, and the intent to call to mind and create a likelihood of confusion with regard to and/or trade off Plaintiffs' Asserted Marks.

160.    Defendants' use of Plaintiffs' registered Asserted Marks (a) constitutes infringement of Plaintiffs' Asserted Marks; (b) is likely to confuse, mislead, or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Defendant or Defendants' Infringing Products with Plaintiffs or Plaintiffs' products; and (c) is likely to cause such people to believe in error that Defendants' Infringing Products have been authorized, sponsored, approved, endorsed, or licensed by Plaintiffs or that Defendants are in some way affiliated with Plaintiffs.

161.    Plaintiffs have no control over the nature and quality of the Infringing Products offered by Defendants, and Plaintiffs' reputation and goodwill will be damaged – and the value of Plaintiffs' registered Asserted Marks jeopardized – by Defendants' continued use of Plaintiffs' Asserted Marks and/or confusingly similar marks.  Because of the likelihood of confusion between Defendants' Infringing Products and Plaintiffs' Asserted Marks, any defects, objections, or faults found with Defendants' Infringing Products will negatively reflect upon and injure the reputation that Plaintiffs have established for the products it offers in connection with Plaintiffs' registered Asserted Marks. As such, Defendants are liable to Plaintiffs for infringement of their registered marks under 15 U.S.C. §1114.

162.    As a direct and proximate result of Defendants' wrongful acts, Plaintiffs have suffered, continue to suffer, and/or are likely to suffer damage to their trademarks, business reputation, and goodwill that money cannot compensate. Unless enjoined, Defendants will continue to use Plaintiffs' registered Asserted Marks and/or confusingly similar marks, and will cause irreparable damage to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Thus, Plaintiffs are entitled to an injunction restraining Defendants and, as applicable, Defendant KickRich's other officers, members, agents, servants, and employees, and all persons acting in concert with them, from engaging in further acts of infringement.

163.    Plaintiffs are further entitled to recover from Defendants the actual damages Plaintiffs have sustained, are sustaining, and/or are likely to sustain as a result of Defendants' wrongful acts.

164.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are also entitled to recover its costs of suit and its attorneys' fees because this is an exceptional case.

## COUNT II: FALSE DESIGNATION OF ORIGIN / UNFAIR COMPETITION IN VIOLATION OF 15 U.S.C § 1125(A)

165.    Plaintiffs repeats and alleges each and every allegation of paragraphs 1 through __, above, as though fully set forth herein.

166.    The Nike Asserted Marks and the Converse Asserted Marks are federally registered and entitled to protection under federal and common law. Nike has extensively and continuously promoted and used the Nike Asserted Marks and the Converse Asserted Marks for many decades in the United States and worldwide. Through that extensive and continuous use, the Nike Asserted Marks and the Converse Asserted Marks have become famous and well-known indicators of the origin and quality of Plaintiffs' products.

167.    To the extent not registered on the Principal Register, the Nike Asserted Marks and the Converse Asserted Marks are not functional and are well-known indicators of the origin and quality of Plaintiffs' products.

168.    Defendants' unauthorized use of Plaintiffs' Asserted Marks and/or confusingly similar marks constitutes a false designation of origin that is likely to cause consumer confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants and/or Defendants' Infringing Products by creating the false and misleading impression that Defendants' Infringing Products are manufactured by, authorized by, or otherwise associated with Plaintiffs.

169.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff has suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and goodwill that money cannot compensate. Unless enjoined, Defendants will continue to use Plaintiffs' Asserted Marks and/or confusingly similar marks and will cause irreparable damage to Plaintiffs for which Plaintiffs have no adequate remedy at law. Thus, Plaintiffs are entitled to an injunction precluding Defendants and, as applicable, Defendant KickRich's other officers, members, agents, servants, and employees, and all persons acting in concert with them, from using Plaintiffs' Asserted Marks and/or confusingly similar marks in connection with Defendants and the promotion, marketing, offer to sell, or sale of any Defendants' products.

170.    Plaintiffs are further entitled to recover from Defendants the actual damages Plaintiffs have sustained, are sustaining, and/or are likely to sustain as a result of Defendants' wrongful acts.

171.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are also entitled to recover its costs of suit and its attorneys' fees because this is an exceptional case.

## COUNT III: TRADEMARK DILUTION
## IN VIOLATION OF 15 U.S.C. § 1125(C)

172.    Plaintiffs repeat and allege each and every allegation of paragraphs 1 through ___, above, as though fully set forth herein.

173.    At least the following marks (collectively, the "Diluted Marks") have become famous throughout the United States as a result of the duration, extent, and geographical reach of advertising and publicity, the amount, volume, and geographical extent of Nike's sales and trading areas, their channels of trade, their degree of recognition, and registration of the marks:

        a.    <u>Nike Asserted Marks</u>: the NIKE word mark, the Swoosh design, the Nike and Swoosh combined design mark, the JUST DO IT word mark, the Jumpman design mark, the JUMPMAN word mark, the AIR JORDAN word mark, the DUNK word mark, and the AIR FORCE 1 word mark.

        b.    <u>Converse Asserted Marks</u>: the Converse All Star Patch design and the Star in Circle design.

174.    Because Plaintiffs' products bearing the Diluted Marks have gained a reputation synonymous with fashion, quality, styling, and authenticity, the Diluted Marks has gained substantial renown.  Defendant has used and continues to use in commerce the Diluted Marks or confusingly similar marks in connection with the advertisement, promotion, and sale of Defendants' Infringing Products.

175.    Defendants' use of the Diluted Marks and/or confusingly similar marks has caused, continues to cause, and/or is likely to cause irreparable injury to and dilution of the distinctive quality of the Diluted Marks in violation of Plaintiffs' rights under 15 U.S.C. § 1125(c). Defendants' wrongful use of the Diluted Marks mark is likely to cause dilution by blurring and the whittling away of the distinctiveness and fame of the Diluted Marks.

176.    As a direct and proximate result of Defendants' wrongful acts, Plaintiffs have suffered, continue to suffer, and/or are likely to suffer damage to their trademarks, business reputation, and goodwill that money cannot compensate. Unless restrained, Defendants will continue to use the Diluted Marks and/or confusingly similar marks and will cause irreparable damage to Plaintiffs for which Plaintiffs have no adequate remedy at law. Thus, Plaintiffs are entitled to an injunction restraining Defendants and, as applicable, Defendant KickRich's other officers, members, agents, servants, and employees, and all persons acting in concert with them, from engaging in further acts of dilution.

177.    Plaintiffs are further entitled to recover from Defendants the actual damages Plaintiffs have sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts.

178.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are also entitled to recover its costs of suit and its attorneys' fees because this is an exceptional case.

## COUNT IV: COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

179.    Plaintiffs repeat and allege each and every allegation of paragraphs 1 through __, above, as though fully set forth herein.

180.    Nike was the first to use the Nike Asserted Marks and Converse was the first to use the Converse Asserted Marks. As a result of Plaintiffs' continuous promotion and sales of products bearing Plaintiffs' Asserted Marks for many decades, Plaintiffs' Asserted Marks have become widely known, and Nike and Converse have been identified in the public mind as the manufacturer of the products to which the Nike Asserted Marks and the Converse Asserted Marks, respectively are applied.

COMPLAINT - Page 60

181.    As a result of the experience, care, and service of Plaintiffs in producing the products to which Plaintiffs' Asserted Marks are applied, these products have become widely known and have acquired a worldwide reputation for fashion, quality, styling, and authenticity. Moreover, the Nike Asserted Marks and the Converse Asserted Marks have come to symbolize Nike's and Converse's respective reputations for quality and excellence.

182.    Defendants, with knowledge and intentional disregard of Plaintiffs' rights, continue to advertise, promote, and sell products using Plaintiffs' Asserted Marks and/or confusingly similar marks. Defendants' acts have caused, continue to cause, and/or are likely to cause confusion as to the source and/or sponsorship of Plaintiffs' products.

183.    Defendants' acts alleged herein and specifically, without limitation, Defendants' use, manufacture, promotion, offers to sell, and/or selling in the United States numerous products that are confusingly similar to products bearing Plaintiffs' Asserted Marks, infringe Plaintiffs' exclusive trademark rights in violation of the common law.

184.    As a direct and proximate result of Defendants' wrongful acts alleged above, Plaintiffs have suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and goodwill that money cannot compensate. Unless restrained, Defendants will continue to use Plaintiffs' Asserted Marks and/or confusingly similar marks and will cause irreparable damage to Plaintiffs for which Plaintiffs have no adequate remedy at law. Thus, Plaintiffs are entitled to an injunction restraining Defendants and, as applicable, Defendant KickRich's other officers, members, agents, servants, and employees, and all persons acting in concert with them, from using Plaintiffs' Asserted Marks and/or any confusingly similar marks in connection with Defendants and the promotion, marketing, offer to sell, or sale of any Defendants' products.

## COUNT V: TRADEMARK DILUTION

## IN VIOLATION OF O.R.S. § 647.107

185.    Plaintiffs repeat and allege each and every allegation of paragraphs 1 through __, above, as though fully set forth herein.

186.    The Diluted Marks have become famous throughout Oregon.

187.    Because Plaintiffs' products bearing the Diluted Marks have gained a reputation synonymous with fashion, quality, styling, and authenticity, the Diluted Marks has gained substantial renown.  Defendant has used and continues to use in commerce the Diluted Marks or confusingly similar marks in connection with the advertisement, promotion, and sale of Defendants' Infringing Products.

188.    Defendants' use of the Diluted Marks and/or confusingly similar marks has caused, continues to cause, and/or is likely to cause irreparable injury to and dilution of the distinctive quality of the Diluted Marks in violation of Plaintiffs' rights under O.R.S. § 647.107. Defendants' wrongful use of the Diluted Marks mark is likely to cause dilution by blurring and the whittling away of the distinctiveness and fame of the Diluted Marks.

189.    As a direct and proximate result of Defendants' wrongful acts, Plaintiffs have suffered, continue to suffer, and/or are likely to suffer damage to their trademarks, business reputation, and goodwill that money cannot compensate. Unless restrained, Defendants will continue to use the Diluted Marks and/or confusingly similar marks and will cause irreparable damage to Plaintiffs for which Plaintiffs have no adequate remedy at law. Thus, Plaintiffs are entitled to an injunction restraining Defendants and, as applicable, Defendant KickRich's other officers, members, agents, servants, and employees, and all persons acting in concert with them, from engaging in further acts of dilution.

## JURY DEMAND

190.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for:

1.    A judgment and order that Defendants have willfully (A) infringed Plaintiffs' Asserted Marks in violation of 15 U.S.C. §1114, (B) used false designations of origin in violation of 15 U.S.C § 1125(a), (C) diluted at least the Diluted Marks in violation of 15 U.S.C. § 1125(c) and O.R.S. § 647.107, and (D) violated Plaintiffs' common law rights in Plaintiffs' Asserted Marks.

2.    A judgment and order enjoining Defendants and Defendant KickRich's affiliates, officers, agents, employees, attorneys, and all other persons acting in concert with Defendants, during the pendency of this action and permanently thereafter from:

   a.    Manufacturing, transporting, promoting, advertising, publicizing, distributing, offering for sale, or selling any products (including but not limited to the Infringing Products) under Plaintiffs' Asserted Marks, any marks substantially indistinguishable therefrom, or any other marks, names, symbols, or logos which are likely to cause confusion or to cause mistake or to deceive persons into the erroneous belief that any products that Defendants caused to enter the stream of commerce or any of Defendants' commercial activities are sponsored or licensed by Plaintiffs, are authorized by Plaintiffs, or are connected or affiliated in some way with Plaintiffs or Plaintiffs' Asserted Marks;

   b.    Manufacturing, transporting, promoting, advertising, publicizing, distributing, offering for sale, or selling any products (including but not

limited to the Infringing Products) under Plaintiffs' Asserted Marks, any marks substantially indistinguishable therefrom, and/or confusingly similar marks;

c.      Implying Plaintiffs' approval, endorsement, or sponsorship of, or affiliation or connection with, Defendants' products, services, or commercial activities, passing off Defendants' business as that of Plaintiffs, or engaging in any act or series of acts which, either alone or in combination, constitutes unfair methods of competition with Plaintiffs and from otherwise interfering with or injuring Plaintiffs' Asserted Marks or the goodwill associated therewith;

d.      Engaging in any act which is likely to dilute the distinctive quality of the Diluted Marks and/or injures Plaintiffs' business reputation;

e.      Representing or implying that Defendants are in any way sponsored by, currently affiliated with, or licensed by Plaintiffs; or

f.      Knowingly assisting, inducing, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 2(a) to (e) above.

3.      An order that Nike and Converse are the exclusive owners of the Nike Asserted Marks and Converse Asserted Marks, respectively, and that such marks are valid and protectable;

4.      An order that Defendants be required to deliver to Plaintiffs for destruction any and all shoes, apparel, digital files, packaging, printed graphics, promotional materials, business cards, signs, labels, advertisements, flyers, circulars, and any other items in any of their possession,

custody, or control bearing Plaintiffs' Asserted Marks, any marks substantially indistinguishable therefrom, confusingly similar marks;

5.      An order granting an award of damages suffered by Plaintiffs according to proof at the time of trial;

6.      An order that Defendants account to Plaintiffs for any and all profits earned as a result of Defendants' acts in violation of Plaintiffs' rights,

7.      An award of statutory damages pursuant to 15 U.S.C. § 1117(c);

8.      An order granting pre-judgment interest on any recovery by Plaintiffs;

9.      An order granting an award of Plaintiffs' costs, expenses, and reasonable attorneys' fees; and

10.     Granting such other and further relief as is just and proper.

Dated: July 19, 2021               STOEL RIVES LLP

By: */s/ B. John Casey*
   B. John Casey (OSB No. 120025)
   John.Casey@stoel.com

   Christopher J. Renk (*pro hac vice* to be filed)
   Chris.Renk@arnoldporter.com
   Michael J. Harris (*pro hac vice* to be filed)
   Michael.Harris@arnoldporter.com
   ARNOLD & PORTER KAYE SCHOLER LLP
   70 West Madison Street, Suite 4200
   Chicago, Illinois 60602-4231
   Telephone: (312) 583-2300
   Facsimile: (312) 583-2360

   Rhonda R. Trotter (*pro hac vice* to be filed)
   Rhonda.Trotter@arnoldporter.com
   ARNOLD & PORTER KAYE SCHOLER LLP
   777 South Figueroa Street, 44th Floor
   Los Angeles, California 90017-5844
   Telephone: (213) 243-4000
   Facsimile: (213) 243-4199